In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-15-00286-CR
_____

BRIAN VANORMAN, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 221st District Court
Montgomery County, Texas
Trial Cause No. 15-03-02762 CR

**MEMORANDUM OPINION**

A grand jury indicted Appellant Brian Vanorman (Vanorman or Appellant)

for burglary of a habitation, with enhancements for prior felony convictions.[1] *See*

Tex. Penal Code Ann. § 30.02(d) (West 2011). The jury found Vanorman guilty on

_____

[1]The indictment also charged Vanorman with one count of assault on a public servant. *See* Tex. Penal Code Ann. § 22.01(b)(1) (West Supp. 2015). The jury found Vanorman "not guilty" on this second charge. Because this appeal only raises issues pertaining to the charge of burglary of a habitation, we do not address any of the testimony or evidence relating to the charge of assault on a public servant. *See* Tex. R. App. P. 47.1.

1

the charge of burglary of a habitation, found the enhancement allegations to be "true[,]" and sentenced him to sixty years' confinement. Vanorman timely appealed, raising three issues concerning the admission of certain evidence. We affirm.

EVIDENCE AT TRIAL

Testimony of K.F.[2]

K.F. testified that, on the evening of June 8, 2014, she called 911 to report that Vanorman, a man whom she had dated, had broken into her home at 636 Durham and had hit her on the head. According to K.F., after she had gone to sleep that night, she was awakened by "very loud banging" on her front door. She went to the door, opened the door, and told Vanorman to go away, but he would not leave and he said "[w]hat do you mean telling me I can't come in?" K.F. explained that she then shut and locked the door, and as she was returning to her bedroom, she heard banging on her roof that sounded like a rock or a brick. K.F. testified that "[Vanorman] had pulled some of the stone pavers out of [her] flower bed and thrown them up on [the] roof." She also saw that he had taken a table and lantern from her patio and put them in his truck.

---

[2] We identify the victim by her initials. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims the "right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

K.F. told the jury that Vanorman started banging on her back door and that she opened the back door, told him to bring back the table and leave her things alone, and told him "I have been trying to get rid of you forever, for over a year, and you won't go away. You have got to go away." According to K.F., Vanorman then threw an alcoholic drink on her, she shut the door, and Vanorman then started kicking in the back door. K.F. explained that Vanorman kicked the door at least three times from outside, he broke the glass in the door, and she could see Vanorman's foot come through the glass. K.F. saw Vanorman reach through the broken glass for the doorknob and unlock the door, at which point K.F. went to her kitchen where she had a phone. K.F. explained that she and Vanorman argued and he said "[y]ou can't tell me no." When K.F. reached for the phone, Vanorman grabbed her hair and pulled her back.

K.F. called 911 to say that someone had broken into her house and was still in the house. K.F. testified that, while she was on the phone with 911, Vanorman hit her on the back of her head, but she did not see what he used to hit her. K.F. explained that she did not consent to Vanorman being in her house that evening as follows:

[State's attorney]: On June 8th of 2014, did Brian [Vanorman] live in your home?

[K.F.]: No, ma'am.

3

[State's attorney]: Did you allow him into your home?

[K.F.]: No, ma'am.

[State's attorney]: Did he come in without your consent?

[K.F.]: Yes, ma'am.

[State's attorney]: And when he hit you, did it cause you pain?

[K.F.]: Yes, ma'am.

K.F. also told the jury that she met Vanorman in 2008 and started a romantic relationship with him soon after they met. She explained that Vanorman moved in with her shortly after they started dating and that Vanorman lived with her for several months. According to K.F., Vanorman moved out later in 2008 because he had gotten a job in another city, but K.F. agreed at trial, that she still considered that they were "boyfriend and girlfriend[]" at the time he moved out.

K.F. testified that, at the end of 2008, Vanorman started drinking more and his behavior changed. Sometime in 2009, however, K.F. came to believe that her relationship with Vanorman was not good for her. At some point during 2010, K.F. decided she no longer wanted to be in a relationship with Vanorman, but she and Vanorman continued to talk by phone. According to K.F., even after she told Vanorman to stay out of her life, he would call her every morning about 5:00 a.m. K.F. became upset because Vanorman would not stop calling. She explained that:

4

The majority of the time I would try and get him to not call or I was rude to him. There were some times that I did talk to him. I mean, sometimes it's easier just to have a conversation than to be mad. But the majority of the time I would tell him to quit calling me.

At trial, the State approached the bench about questioning K.F. "about some extraneous[]" events that related to the nature of the relationship between K.F. and Vanorman, to show how the relationship had "degraded[,]" and also to further establish that Vanorman was at K.F.'s home without her consent on June 8, 2014. The court allowed the testimony and overruled defense objections (which we discuss in further detail later herein). K.F. then testified regarding three events involving Vanorman that occurred at her home.

(1) *The Pizza Hut incident.*

K.F. testified that, one night during 2012, Vanorman followed K.F. home from Pizza Hut, and when he pulled into her driveway, he was so close behind her that his vehicle blocked her garage door. K.F. told Vanorman to leave, but he would not leave. According to K.F., Vanorman paced back and forth and repeatedly asked her about her plans, and she told him "it was none of his business." After Vanorman left, she went to her car to get her purse, but her purse was gone. K.F. testified that she called Vanorman about her purse, and he told her "If you want your purse, it's all -- I threw it all out along I-45. You [have] to go get

5

it." K.F. explained that Vanorman later changed his mind, he brought her purse back, and he apologized.

(2) *The garage door incident.*

K.F. testified that, about a month or two after the Pizza Hut incident, Vanorman came to her home one evening and banged on both the front and back doors, and Vanorman continued to call her while he was banging on the doors. According to K.F., she heard banging at the door from her garage into her kitchen, even though her garage door had been shut and Vanorman did not have a remote to open the garage door. Once K.F. felt safe and believed that Vanorman had left, she went into the garage where she noticed "the garage door bent in. And there was an opening that he apparently had been able to crawl in to get to [her] back door." K.F. explained that she did not call 911 that night because her brother-in-law was then running for constable, and she did not want to cause her brother-in-law any negative attention.

(3) *The bedroom incident.*

K.F. told the jury that, sometime in 2012, Vanorman walked into her bedroom while she was asleep. According to K.F., Vanorman had come into the house through the back French doors, which he had pried open. Vanorman came

into her bedroom and said "I want to see you." K.F. explained that she had not invited Vanorman over, and it was after midnight when he came into the house.

Testimony of Sergeant Swilling

Senior Sergeant Swilling (Swilling) with the Montgomery County sheriff's office testified that, on the night of June 8, 2014, he received a dispatch call of "a family violence assault." Swilling testified that when the officers arrived at the scene, a truck was parked in the driveway with the driver's side door open, K.F. was hiding in her bedroom, and she was "very upset, crying, scared, shaking." K.F. told Swilling that her attacker had hit her on the head. The officers found Vanorman outside after searching for him for five to ten minutes. Swilling testified that he could smell alcohol on Vanorman and that Vanorman was "sweaty and muddy."

The prosecutor showed Swilling photographs of K.F.'s house that were taken that night, and Swilling described the photographs as depicting "picture frames and stuff that were scattered about on the floor . . . a bunch of flipped over furniture and broken glass[.]" Swilling explained that he regarded the broken glass on the floor by the back door as indicative of a "forced entry[,]" but Swilling also acknowledged it was possible the glass in the door was broken from inside the house.

7

<u>Testimony of Deputy Henson</u>

Deputy Henson (Henson) with the Montgomery County sheriff's office testified that he was on duty on June 8, 2014, and that he received a call of "trespass in progress or family violence in progress[]" at 636 Durham. Henson explained that the officers made contact with K.F. soon after arriving at the home and that she appeared "frazzled[,]" very upset, and was sobbing. Henson testified that K.F. said Vanorman had tried to step inside the house and she would not let him in. According to Henson, K.F. told Vanorman to leave and explained to Henson that

> . . . her ex had [come] to the door and wanted to come in. She told him no, at which time he went around to the back side of the house, threw something through a window and then he kicked in the door and came into the house.

Henson also testified that K.F. told the officers that Vanorman had thrown large landscaping stones onto the roof and also that he had "punched her in the back of the head."

Henson testified that he observed two cinder blocks or landscaping stones on the roof of K.F.'s house, glass was on the floor of the house, items inside the house had been turned over, and the house was "pretty trashed." According to Henson, as he and Sergeant Swilling were searching the property, they encountered Vanorman. Henson explained that the officers were able to identify Vanorman by

8

his state identification card. Vanorman told the officers he lived in Magnolia or was coming from Magnolia, and Vanorman did not tell the officers that he resided at 636 Durham. Henson testified that he found no men's clothing, shoes, or toiletries inside K.F.'s house.

Defense Witnesses

Vanorman's mother (Mother) testified that Vanorman and K.F. had "been together for many years[]" and that Mother had given Vanorman "a washer and a dryer, tables, chairs, a quilt for [the] bed, and dishes[]" for the house at 636 Durham. Vanorman's sister testified that she employed K.F. at her office for a while and agreed she maintained "some sort of relationship" with K.F. even after K.F. no longer worked for her. Vanorman did not testify at trial.

Video recordings made from cameras in the officers' vehicles were played for the jury as well as the audio recording of K.F.'s 911 call. Photographs of K.F.'s home were also admitted into evidence.

ISSUES ON APPEAL

Appellant argues that the trial court erred in admitting certain evidence of prior bad acts. In his first issue, Appellant challenges the admission of evidence of the Pizza Hut incident, the garage door incident, and the bedroom incident. Appellant argues that all of the prior-bad-act evidence was inadmissible under

9

Rules 404(b) and 403 and that admission of such evidence affected Appellant's substantial rights pursuant to Texas Rule of Appellate Procedure 44.2(b).[3]

The State argues that the prior-bad-act evidence was relevant to establish the relationship between K.F. and Vanorman, and to rebut Vanorman's contention that he lawfully entered K.F.'s home on the night of the incident and that

> . . . [t]he appellant's reliance on the nature of the relationship and his living arrangements to permit his entry necessitated the introduction of evidence establishing the previous deterioration of the relationship between the appellant and K.F., and the fact that the appellant had long been excluded from K.F.'s home.

STANDARD OF REVIEW

We review a trial court's decision to admit evidence and overrule objections for an abuse of discretion. *See De La Paz v. State*, 279 S.W.3d 336, 343-44 (Tex. Crim. App. 2009). "As long as the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the trial court's ruling will be upheld." *Id.* (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)); *State v. Mechler*, 153 S.W.3d 435, 439-40 (Tex. Crim. App. 2005). If the trial court's decision is correct on any theory of law

---

[3] Effective April 1, 2015, the Texas Supreme Court and Texas Court of Criminal Appeals adopted amendments to the Texas Rules of Evidence. *See* 78 Tex. B.J. 42 (Tex. 2015). The amendments were part of a restyling project. *Id.* at 42. All citations to the rules of evidence in this opinion refer to the rules in effect at the time Vanorman's trial commenced on March 30, 2015.

applicable to the case, we will uphold the decision. *De La Paz*, 279 S.W.3d at 344; *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002).

The erroneous admission or exclusion of evidence is generally reviewed under the standard for nonconstitutional error contained in Rule 44.2(b) of the Texas Rules of Appellate Procedure if the trial court's ruling merely offends the rules of evidence. *Melgar v. State*, 236 S.W.3d 302, 308 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); *see also Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). Under Rule 44.2(b), even if the trial court erred in admitting the evidence, we may not overturn a criminal conviction for nonconstitutional error if, after examining the record as a whole, we have fair assurance that the error did not have a substantial and injurious effect or influence in determining the jury's verdict. *Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007). In our determination of whether error adversely affected the jury's decision, we consider everything in the record, including testimony, physical evidence, jury instructions, the State's theories, any defensive theories, closing arguments, and voir dire. *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014).

EXTRANEOUS CONDUCT OR PRIOR-BAD-ACTS EVIDENCE

Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in

accordance with the character. Tex. R. Evid. 404(b). Rule 404(b) codifies the common law principle that a defendant should be tried only for the offense for which he is charged and not for other extraneous crimes. *Rogers v. State*, 853 S.W.2d 29, 32 n.3 (Tex. Crim. App. 1993); *see also Segundo v. State*, 270 S.W.3d 79, 87 (Tex. Crim. App. 2008).

To preserve error in the admission of extraneous bad acts, the defendant must first timely object that the evidence is inadmissible under Rule 404(b) of the Texas Rules of Evidence. *See Montgomery*, 810 S.W.2d at 387. To preserve error for appellate review under Texas Rule of Appellate Procedure 33.1(a), the record must show that (1) the complaining party made a timely and specific request, objection, or motion; and (2) the trial judge either ruled on the request, objection, or motion (expressly or implicitly), or he refused to rule and the complaining party objected to that refusal. Tex. R. App. P. 33.1(a); *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003). When the specific basis for the objection can be determined from the context, a general objection may be enough to preserve error. *Zillender v. State*, 557 S.W.2d 515, 517 (Tex. Crim. App. 1977).

> Of critical importance is whether the trial court understood appellant's objection, including the legal basis for the objection. Where the record makes clear that the trial court understood an objection and its legal basis, a trial court's ruling on that objection will be preserved for appeal, despite an appellant's failure to clearly articulate the objection.

*Taylor v. State*, 939 S.W.2d 148, 154-55 (Tex. Crim. App. 1996) (citing to *Cofield v. State*, 891 S.W.2d 952, 954 (Tex. Crim. App. 1994)).

"Rule 404(b) sets out an illustrative, not exhaustive, list of exceptions to the prohibition against admitting evidence of extraneous offenses including 'proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" *Daggett v. State*, 187 S.W.3d 444, 451 n.13 (Tex. Crim. App. 2005) (quoting Tex. R. Evid. 404(b)) (emphasis omitted); *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005). The Court of Criminal Appeals has explained that "'Rule 404(b) is a rule of inclusion rather than exclusion.' The rule excludes only that evidence that is offered (or will be used) solely for the purpose of proving bad character and hence conduct in conformity with that bad character." *De La Paz*, 279 S.W.3d at 343 (footnotes omitted) (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000) (discussing Fed. R. Evid. 404(b))).

"Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court." *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). Texas courts utilize a two-step analysis for determining the admissibility of extraneous offenses or uncharged acts. *Rogers*, 853 S.W.2d at 32-33. Courts determine first whether the evidence is relevant to a material issue in the case and second whether the relevant evidence

should be admitted as an exception to Rule 404(b). *Id.* The trial court's Rule 404(b) ruling admitting evidence is generally within the zone of reasonable disagreement "if there is evidence supporting that an extraneous transaction is relevant to a material, non-propensity issue." *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). A defendant's assertion of a defensive theory "opens the door" to the admission of extraneous-conduct evidence to rebut the defensive theory. *See Powell v. State*, 63 S.W.3d 435, 438-40 (Tex. Crim. App. 2001); *Halliburton v. State*, 528 S.W.2d 216, 218 (Tex. Crim. App. 1975); *Jones v. State*, 241 S.W.3d 666, 669 (Tex. App.—Texarkana 2007, no pet.); *Deleon v. State*, 126 S.W.3d 210, 216 & n.6 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

Evidence that is admissible under Rule 404(b) may nonetheless be inadmissible under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, considerations of undue delay, or needless presentation of cumulative evidence. *Casey*, 215 S.W.3d at 879; *see also* Tex. R. Evid. 403. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence is more probative than prejudicial. *Jones v. State*, 944 S.W.2d 642, 652 (Tex. Crim. App. 1996). Unfair prejudice does not mean simply that the evidence injures the opponent's case. *Rogers v. State*, 991 S.W.2d 263, 266 (Tex. Crim. App. 1999).

14

"Rather[,] it refers to 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Id.* (quoting *Cohn v. State*, 849 S.W.2d 817, 820 (Tex. Crim. App. 1993)). The Rule 403 balancing factors include, but are not limited to, the following: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Hernandez v. State*, 390 S.W.3d 310, 324 (Tex. Crim. App. 2012); *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006). The trial court is presumed to have engaged in the required balancing test under Rule 403 once a party objects on the ground of Rule 403 and the trial court rules on the objection, unless the record indicates otherwise. *See Williams v. State*, 958 S.W.2d 186, 195-96 (Tex. Crim. App. 1997). The party opposing admission of the evidence bears the burden to demonstrate that the danger of unfair prejudice substantially outweighs the probative value. *See Kappel v. State*, 402 S.W.3d 490, 494 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

## ANALYSIS

In order to prove burglary of a habitation, the State must prove, among other elements, that the defendant entered the habitation without the effective consent of the owner. Tex. Penal Code Ann. § 30.02(a); *see also Ex parte Cavazos*, 203

15

S.W.3d 333, 337 (Tex. Crim. App. 2006) (citing *DeVaughn v. State*, 749 S.W.2d 62, 65 (Tex. Crim. App. 1988)) ("the gravamen of a burglary is the entry without the effective consent of the owner and with the requisite mental state"). During its opening statement, the defense argued in relevant part:

> I think the evidence is going to show that my client, [Vanorman], and [K.F.] had been in a relationship for more than seven years. I think the evidence is going to show that when the police found him in the backyard, his driver's license -- excuse me -- his Texas identification card has the address 636 Durham, which is the address of the alleged burglary. I think the evidence is going to show that the truck that is parked in the front of the house, in the driveway, is registered to 636 Durham.
>
> This is a lover's quarrel. This is a relationship that I think I agree with the prosecutor has been on and off for a period of time. And I agree with her, as well, that [K.F.] did take him back in regularly right up and before the alleged burglary in this case.

When the State sought to introduce evidence of the Pizza Hut incident, the garage door incident, and the bedroom incident, the prosecutor explained that "[w]e believe that these are [] appropriate extraneous[] [events] to bring up in light of the Defense's opening statement that [Vanorman] was there with [K.F.'s] consent that night on June 8th of 2014." The defense objected as follows:

> Judge, I have two responses. I guess the first one is I think it would be extremely prejudicial -- and to not conduct a 403 analysis anywhere close. Okay? There is nothing to rebut absence of mistake or anything of that nature. Apparently we are talking about two years before. The remoteness.

In addition, Judge, the evidentiary analysis that has been brought up today. And further, Judge, if this comes in, I think the State opens the door to Brady notice of her [drug] usage --)

. . . .

Judge, I don't think it would ever pass a 403 analysis, to go back over two years before the alleged incident. It is remote[.]

The State responded that "[Rule] 404 has no remoteness requirement[,]" that the evidence was relevant to show the nature of the relationship between Vanorman and K.F., that Vanorman was not living at K.F.'s house at the time of this incident, and that the evidence would provide helpful "context" for the jury. The trial court admitted the evidence and explained:

. . . I think since you have already made a big deal about the truck and registered to the house and the address that he gave is that address, and I think that the insinuation was that he lived there -- that he was living there, I think that kind of opens the door to him not living there. And if he was showing up there on other dates and didn't live there on other -- I don't know. I think it might go to some relevance toward that.

. . . .

. . . I think it does go to show he wasn't living there. He might have been using the address, but I don't think he was living there, from their point of view.

The Appellant's brief notes that he objected to the admission of the extraneous-conduct evidence "based on the extremely prejudicial nature of the evidence under a Rule 403 analysis." The Appellant does not argue that he

17

specifically objected to the evidence on the basis of Rule 404 at trial; however, Appellant argues on appeal that evidence of the three incidents were inadmissible under Rule 404(b).

Assuming without deciding that Appellant sufficiently preserved error as to Rule 404(b), we conclude that the trial court did not err under Rule 404(b) in admitting the complained-of evidence. The trial court could have reasonably concluded that evidence concerning the Pizza Hut incident, the garage door incident, and the bedroom incident was relevant to rebut a defensive theory regarding consent and that the evidence was not admitted "solely for the purpose of proving bad character and hence conduct in conformity with that bad character." *See De La Paz*, 279 S.W.3d at 343. Because there was evidence that the complained-of extraneous conduct was relevant to a material, non-propensity issue, admission of such evidence is within the zone of reasonable disagreement. *See Devoe*, 354 S.W.3d at 469. We also note that the jury charge included a limiting instruction concerning prior bad acts, and we presume the jury followed this instruction. *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009).

Appellant also argues that the prior-bad-act evidence was not relevant to any material issue at trial, but to the extent it may have been relevant, it was unduly prejudicial under Rule 403. As we have already explained herein, we presume that

the trial court conducted the proper balancing test when it overrules a Rule 403 objection. The trial court is not required to place the results of its balancing test on the record. *Williams*, 958 S.W.2d at 195. The record before us does not affirmatively show that the trial court refused to conduct a Rule 403 balancing test. Rather, the trial court overruled the Rule 403 objection. We presume the trial court engaged in a balancing test before the court ruled on the objection. Furthermore, Rule 403 favors the admission of relevant evidence, and relevant evidence carries a presumption that it is more probative than prejudicial. *Id.* at 196. Appellant has failed to overcome the presumption that the evidence was more probative than prejudicial. *See id.* at 195-96.

Finally, even assuming the trial court erred in admitting the complained-of evidence, we will not reverse the judgment if the error was harmless. *See* Tex. R. App. P. 44.2. In this case, the jury heard K.F. testify that she asked Vanorman to leave her house on the night of June 8, 2014, that he broke the glass in the back door, and that he hit her on the head. Swilling and Henson testified that, after responding to the dispatch call to K.F.'s house, they found Vanorman outside, that K.F. said Vanorman had broken into her house and had hit her, and that broken glass was on the floor inside K.F.'s house. Henson also testified that he found no men's clothing or personal items inside K.F.'s house. Henson explained that he

19

observed two cinder blocks or landscaping stones on the roof of K.F.'s house and that K.F. had told the officers Vanorman had thrown the blocks or stones onto her roof. Further, the jury heard a recording of K.F.'s 911 call and saw photographs taken of her home on the night of the incident.

Based on the record before us, we believe there is little risk that the jury would have convicted Vanorman based on the complained-of extraneous conduct evidence, rather than the detailed and extensive evidence that supported the basis of the State's indictment. *See* Tex. R. App. P. 44.2(b). Therefore, we hold that the error in admitting this evidence, if any, did not affect a substantial right of Vanorman and must be disregarded. *See id.*; *Taylor v. State*, 268 S.W.3d 571, 592 (Tex. Crim. App. 2008); *Casey*, 215 S.W.3d at 885.

We overrule all three of Vanorman's issues on appeal, and we affirm the judgment of the trial court.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on September 6, 2016
Opinion Delivered September 21, 2016
Do Not Publish

Before McKeithen, C.J., Kreger and Johnson, JJ.

20